Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4300 | **DATE** | 8/23/2002 |
| **CASE TITLE** | Carl E. Thomas vs. Guardsmark, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   Enter Memorandum Opinion And Order. Defendant's motion for summary judgment (Doc. No. 36-1) is granted and Plaintiff's motion for summary judgment (Doc. No. 40-1) is denied. Judgment is entered in favor of Defendant Guardsmark, Inc.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | AUG 2 6 2002 date docketed | 45 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 8/23/2002 date mailed notice | |
| | ETV | courtroom deputy's initials | Date/time received in central Clerk's Office | ETV mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARL E. THOMAS,<br><br>Plaintiff,<br><br>v.<br><br>GUARDSMARK, INC.<br><br>Defendant. | No. 01 C 4300<br><br>Judge Rebecca R. Pallmeyer |

**DOCKETED AUG 2 6 2002**

## MEMORANDUM OPINION AND ORDER

Plaintiff *pro se* Carl Thomas, a 50-year-old African-American, works for Defendant Guardsmark, Inc., a private security service. Mr. Thomas claims that in the year 2000, Guardsmark discriminated against him on the basis of race and age when it refused to transfer him to an assignment at the North Gate of the CITGO Petroleum refinery. Mr. Thomas contends that Guardsmark's conduct violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981. Guardsmark has moved for summary judgment, arguing that Plaintiff has no evidence of race or age discrimination.[1] For the reasons set forth below, the motion is granted.

## FACTS

At an unspecified date in the 1970's, Plaintiff worked briefly for Guardsmark in Memphis, Tennessee, when he was 21 years of age. (10/23/01 Deposition of Carl E. Thomas ("Thomas Dep."), Ex. A to Defendant's Local Rule 56.1 Statement of Facts ("Def.'s 56.1"), at 20, 28.) In September 1998, Guardsmark again hired Thomas, then age 46. (*Id.*, at 5, 20, 30.) After Thomas

---

[1] After Defendant submitted its summary judgment motion, Plaintiff filed a "Memorandum of Law in support of [his] Motion for Summary Judgment." Because this submission does not argue the absence of disputes of fact, the court concludes that it is most fairly read as a response in opposition to Defendant's summary judgment motion.



worked at several different brief assignments, Guardsmark assigned him to the CITGO Petroleum Account in February 2000. (*Id.*, at 30-35, 44-45.) CITGO Petroleum operates an oil refinery in Lemont, Illinois, a very large and complex facility at which CITGO produces oil and petroleum. (Thomas Dep., at 50, 51; 12/28/01 Declaration of Jason Lebron ("Lebron Decl."), Guardsmark Unit Manager, Ex. D to Def.'s 56.1, ¶ 5.) The oil and petroleum products are highly flammable, creating a significant risk of a disastrous fire or explosion. (Thomas Dep., at 51.)

Jason Lebron, a Guardsmark Unit Manager, was responsible for overseeing the Guardsmark operations at CITGO from July 2000 through May 2001. (Lebron Decl. ¶ 3-4.) He testified that Guardsmark security officers receive one of four assignments at the refinery: (a) "Rover," in which the officer drives a vehicle to locations throughout the refinery; (b) "Contractor Gate," in which the officer is assigned to guard the entrance or entrances used by CITGO's contractors and vendors, (c) "South Gate," another refinery entrance, at which there is a guardhouse containing a computer scanner that monitors individuals who enter and leave the refinery at that location; and (d) "North Gate," yet another refinery entrance.[2] (Lebron Decl. ¶¶ 6-10.) The North Gate provides access to the refinery, the communications and dispatch center, and is viewed as the "pulse" of the refinery. (*Id.* ¶ 10.) Although the guardhouse at the North Gate is staffed by only one officer, it is six times larger than the South Gate guardhouse, and contains communications equipment, radio and alarm systems, emergency and non-emergency phones, computers, and monitors, as well as a restroom and locker room. (*Id.*; Declaration of Guardsmark assistant manager Rodney J. Peterson ("Peterson Decl."), Ex. E to Def.'s 56.1 ¶ 7; Pltf.'s 56.1 Resp. ¶ 24.)

---

[2] Plaintiff vigorously disputes Lebron's testimony on this point as well as many other facts presented in Defendant's Local Rule 56.1 Statement. Plaintiff has repeatedly failed to specifically cite the affidavits, parts of the record, and other supporting materials on which he relies, however, and in such instances, the court has deemed Defendant's facts admitted. The court notes further that it provided Plaintiff the *Lewis* warnings owed to *pro se* plaintiffs bringing civil suits in this court. Doc. No. 38.

The North Gate is the central command center for the Refinery, and the officer assigned there is responsible for communicating with everyone in the facility in the event of an incident. (Lebron Decl. ¶ 11; Thomas Dep., at 69; 12/25/01 Declaration of Guardsmark security officer George Kakaletris ("Kakaletris Decl."), Ex. G to Def.'s 56.1 ¶ 7; 12/20/01 Declaration of Guardsmark security officer Henry W. Hansen, III ("Hansen Decl."), Ex. F to Def.'s 56.1 ¶¶ 4,5.) The North Gate security officer is required to prepare a written report concerning any incident, large or small; to contact the fire department, police department or other emergency personnel; and to provide directions to emergency personnel at the refinery. (Lebron Decl. ¶¶ 12, 13.) Plaintiff asserts (without evidentiary support) that officers at the South Gate are also responsible for preparing reports, and points out that a North Gate security officer would be unable to physically accompany emergency personnel to the site of an incident without leaving his station. (Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Facts ("Pltf.'s 56.1 Resp.") ¶¶ 26, 27.) He does not otherwise contest Defendant's descriptions of the responsibilities of an officer assigned to the North Gate, however.

Defendant asserts that assignment to the North Gate position is not a promotion, but acknowledges that the position pays slightly more; for example, when Guardsmark assigned George Kakaletris to the North Gate officer position, Mr. Kakaletris (who does not state when he received this assignment) received a 25 cents per hour pay increase. (Def.'s 56.1 ¶ 28, citing Kakaletris Decl. ¶ 8.)³ Defendant asserts, further, that officers assigned to the North Gate are

---

³ Plaintiff asserts that the modesty of this raise implies that Kakaletris earned more in his previous position as rover or South Gate officer than did older officers with more seniority. (Pltf.'s 56.1 Resp. ¶ 28, citing Guardsmark Table of "Employees active at CITGO Site" ("Guardsmark Table"), Ex. I to Def.'s 56.1.) To the extent Plaintiff believes this alleged disparity supports his own claim of age discrimination, the court notes that Kakaletris's declaration suggests an obvious reason for the modest difference between his pay and that of other security officers: Kakaletris's superior educational qualifications. Kakaletris, who has been employed on Guardsmark's night shift since 1996, earned a bachelor's degree in 1994, a master's degree in December 1997, expected to earn a second master's in May 2002 and has taught courses at four
(continued...)

3

required to have written and oral communication skills, including the ability to speak clearly over the public address and radio systems. (Peterson Decl. ¶¶ 9, 10, Lebron Decl. ¶¶ 13, 14.) Plaintiff offers no evidence rebutting Defendant's assertion that strong communication skills are necessary for the North Gate assignment. Instead, he asserts that officers at every CITGO site should have such skills, and claims that in its response to the EEOC's investigation of his charges, Guardsmark did not mention communication skills and its "guideline for the position was not so stress [sic] out." (Pltf.'s 56.1 Resp. ¶ 30.) The document he cites supports Defendant's position on this issue, however. In a February 9, 2001 letter to the EEOC investigator, Defendant presented a table listing six officers then assigned to the North Gate, and describing each officer's prior computer knowledge, communication skills, and writing ability. (2/9/01 Letter of Gary Leviton to EEOC Investigator Kathleen Leaver, Ex. M to Pltf.'s 56.1 Resp.) The letter states "The main qualification that is *required* for any person working the north gate post is clear and concise speaking skills." (*Id.*, emphasis in original.) On-the-job training for the North Gate position does not include any training specifically designed to improve basic oral or written communication skills. (Peterson Decl. ¶ 11.) Jason Lebron noted that Guardsmark is required to obtain approval from CITGO for any officer assigned to the North Gate, and that on at least one occasion, CITGO requested that the officer assigned by Guardsmark to that position be replaced. (Lebron Decl. ¶ 14.)[4]

When Mr. Thomas began working at CITGO, Guardsmark assigned him to the South Gate position, where he received intensive one-on-one training over a six-day period in computer operations, emergency procedures, and operating the telephone switchboard. (Thomas Dep. at

---

[3](...continued)
different local colleges. (Kakaletris Decl. ¶¶ 2-6.)

[4]     Plaintiff is suspicious of this assertion; he notes that the "only security officer taken off that job in the pass [sic] three months is Lester Bloomingberg, and he is black." (Pltf.'s 56.1 Resp., ¶ 33.) Nothing in Mr. Lebron's Declaration suggests that the incident in which CITGO requested removal of a Guardsmark officer had occurred within the three months prior to Plaintiff's summary judgment response, however.

4

46-47.) He also received one-on-one training for two Rover positions, each of which required four days of lengthy instruction. (*Id.* at 48, 50.) Thomas acknowledges that he fell on the job in February 2001 and failed to report the incident to CITGO. When approached by his supervisor about this incident, Thomas told the supervisor to "shut up." (*Id.*)[5] Thomas told Assistant Manager Rodney Peterson and a co-worker, George Kakaletris, that he often disseminated rumors at CITGO in order to see "how far they would go" and find out "who could be trusted." (Peterson Decl. ¶ 16; Kakaletris Decl. ¶ 13.)

Thomas believes he has the training and qualifications necessary for the North Gate position. (Thomas Dep., at 78.) Guardsmark managers conclude, however, that Mr. Thomas lacks good communication skills, and that he does not write or speak clearly. (Lebron Decl. ¶ 15; Peterson Decl. ¶ 12.) Plaintiff's co-workers, Henry Hansen and George Kakaletris, made the same observations, and reported their concerns to Mr. Peterson. (Hansen Decl. ¶ 6; Kakaletris Decl. ¶ 9.) Mr. Kakaletris recalls that other officers complained to him that they could not understand Mr. Thomas over the radio. (Kakaletris Decl. ¶ 10.) Mr. Kakaletris believes Thomas's writing is "incomprehensible," (*id.*); Mr. Lebron believes Thomas may have the worst writing skills of any Guardsmark employee assigned to the CITGO account, (Lebron Decl. ¶ 15); and Mr. Peterson, who has read several work-related reports prepared by Thomas, also believes his writing skills, including grammar and spelling, are poor. (Peterson Decl. ¶ 12.) Thomas himself admits that his handwriting is illegible and that his writing is "not the best." (Thomas Dep., at 133-34.) Neither party has explained precisely when or how Mr. Thomas requested assignment to the North Gate position at CITGO, but it is undisputed that he was never assigned to that post. Jason Lebron, the CITGO Unit Manager, asserted in his declaration that he has spoken with Thomas on several

---

[5] In his declaration, Unit Manager Lebron recounts other incidents in which Thomas was reprimanded, but because Lebron's Declaration does not demonstrate that Lebron has any first-hand knowledge of these incidents, Plaintiff's objection to these statements is sustained. (Pltf.'s 56.1 Resp., ¶ 38.)

occasions and has read several letters written by him, and that Guardsmark "did not assign Mr. Thomas to the North Gate because he lacked the requisite communication skills." (Lebron Decl. ¶¶ 15, 16.)

At an unspecified date in April 2001, Mr. Thomas, who was already assigned on a part-time basis to work at another Guardsmark account, the Uniquema account, requested a transfer to a full-time position at that account. When that position became available, Guardsmark made the transfer. (Lebron Decl. ¶ 17.; Pltf.'s 56.1 Resp. ¶¶ 15, 49.)

Neither party has offered any statistics concerning the numbers of persons who sought assignment to the North Gate, nor is the court able to determine how the races and ages of those who received the assignment compares with the races and ages of those who sought it. Guardsmark did offer some anecdotal evidence that it does not discriminate: Henry Hansen, a Guardsmark security officer who worked the night shift with Plaintiff during Mr. Thomas's time at CITGO, stated that Guardsmark "regularly" assigned African-American security officers and security officers over the age of 40 to the North Gate. (Hansen Decl., ¶¶ 2, 3, 8, 9.) Guardsmark has presented evidence that several employees assigned to the CITGO account are older than Mr. Thomas and earn more than his $8.50/hour wage rate: Chuck Anderson (55 years old, $9.25/hour); Ron Belligio (61 years old, $9.25/hour); and Carl Bingham (62 years old, $11.00/hour). (Guardsmark Table.) Guardsmark notes, further, that several white individuals assigned to the CITGO account receive the same hourly pay that Mr. Thomas does. (Guardsmark Table.)[6] In

---

[6] Guardsmark's Exhibit I is a list titled "Guardmark (sic) Employees active at CITGO Site." Disappointingly, Guardsmark has not explained who created the list, when it was created, or under what circumstances. The court is not even certain whether the exhibit presents a complete list of all employees assigned to CITGO at a particular time, or is merely intended to demonstrate that some white workers and some younger workers earned the same amounts as Carl Thomas, and that one black worker earned more. The fact that Guardsmark's own name is misspelled in this exhibit does little to enhance its credibility. The court notes, however, that Plaintiff does not contest the factual accuracy of the information that appears in Exhibit I. In any event, the court does not rely on the information presented there to conclude that there are no
(continued...)

addition, Defendant has presented evidence of its equal opportunity, "no slur," and diversity policies. (Guardsmark General Orders and Regulations, Ex. C to Def.'s 56.1.)

Lester Bloomingberg, another African-American employee of Guardsmark, began working for Guardsmark five or six months before Mr. Thomas and was assigned to the CITGO account two or three months before Mr. Thomas. (Thomas Dep., at 79, 80.) Thomas recalled that Mr. Bloomingberg was assigned to the North Gate position after Bloomingberg's supervisor "bragged" about Bloomingberg's fine job performance. (Id., at 80.) Assistant Manager Peterson asserted that Bloomingberg was assigned to the North Gate position "because he was well-spoken, presented himself in a professional manner, and was an ex-Marine able to handle emergency situations." (Peterson Decl. ¶ 22.) Mr. Peterson noted that Guardsmark had assigned Damon Gant, Floyd Harrison, and David Clark, all African-Americans, as well as two Hispanic Americans, to the North Gate position during the 1990's. (Peterson Decl. ¶¶ 17-21.) Plaintiff acknowledged that a 22-year-old white employee was trained for the North Gate position, but was not given the position because his supervisor concluded he was not qualified. (Def.'s 56.1, citing Thomas Dep., at 159.) Finally, Guardsmark notes that African-Americans fill management positions at Guardsmark, including the manager of the company's Las Vegas office (who previously supervised unit managers in Chicago), the Chicago metropolitan human resources specialist, a human resources manager, and a unit manager in the Guardsmark metropolitan Chicago office. (Declaration of Eric Dobyne, manger of Guardsmark's Las Vegas office, Ex. B to Def.'s 56.1, ¶ 5; Lebron Decl. ¶¶ 22-24.)

## DISCUSSION

A motion for summary judgment will be granted only if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c). The court must consider the evidence and draw all reasonable inferences in favor of the

---

[6](...continued)
disputes of fact precluding summary judgment.

nonmoving party, *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001), but the nonmoving party's conclusory allegations alone cannot defeat a summary judgment motion. *See Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137, 1140 (7th Cir. 1998). "Speculation does not create a genuine issue of fact, instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995), *quoted in Tyler v. Runyon*, 70 F.3d 458, 469 (7th Cir. 1995).

Plaintiff asserts that Guardsmark denied him a transfer to the North Gate position on the basis of his race and age. To the extent that Guardsmark contends that he lacks necessary training, Mr. Thomas responds that Guardsmark should have, but failed to, provide him with this training also because he is an African-American or because he is over 40 years of age. To prove his claims where, as here, there is no direct evidence of race or age discrimination, Plaintiff Thomas bears the burden of demonstrating that (1) he is a member of a protected group; (2) he sought and was qualified for assignment to the North Gate; (3) he was rejected for the position; and (4) someone outside the protected group was given the position. *See Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 620 (7th Cir. 2001), citing *Rabinovitz v. Pena*, 89 F.3d 482, 486 (7th Cir.1996) (age discrimination); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001), citing *Payne v. Milwaukee Cty.*, 146 F.3d 430, 434 (7th Cir. 1998) (race discrimination). If his claim rests on a failure to train, Plaintiff must demonstrate that (1) he was a member of the protected group; (2) Guardsmark provided training to its employees for assignment to the North Gate position; (3) he was eligible for training; and (4) he was denied training given to other similarly situated employees who were not members of the protected group. *Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000), citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998).

Defendant does not dispute that Plaintiff is a member of a protected group. Further, although neither party has explained when or how he sought the assignment, it is apparently undisputed that Plaintiff sought assignment to work as a security guard at the North Gate, and was

8

not assigned to that position. Beyond those elements, however, Defendant contends Plaintiff is unable to establish his prima face case of discrimination on the basis of race or age. Plaintiff was not qualified for assignment to the North Gate because he lacked necessary communication skills, Defendant urges. Further, Defendant contends, Plaintiff's failure to train claim fails because Guardsmark does not provide communications skills training to persons seeking that assignment.

As noted above, Plaintiff challenges many of the assertions in Defendant's Rule 56.1 Statement. He disputes Defendant's account of his pre-CITGO job history. (Pltf.'s 56.1 Response ¶¶ 9-16.) He disputes Jason Lebron's statements concerning Plaintiff's disciplinary record. (*Id.* ¶ 38.) He disputes Guardsmark's stated commitment to diversity. (*Id.* ¶¶ 7, 8.) He disputes the weight and significance of Guardsmark's evidence concerning its employment of other older workers and African-Americans. (*Id.* ¶¶ 52-67.) Importantly, however, Plaintiff has not effectively disputed the central facts offered by Guardsmark in support of its motion for summary judgment: the importance of communication skills for the North Gate assignment, and Plaintiff's own inadequacies in that arena. Guardsmark contends that the North Gate is the "nerve center" for the CITGO Refinery, and that the security officer assigned to that location must be capable of effective written and oral communications, particularly in the event of an emergency. Plaintiff insists that security officers in any assignment require communication skills, but he acknowledges that the "North Gate is the central command center for the entire CITGO Refinery" in an emergency and himself pointed out that the emergency radio and telephone system located at another gate is "never in use except in the case of a black out or emergency of which [sic] the radios at the North Gate goes out. . . ." (*Id.* ¶ 25.)

On the record before the court, Plaintiff Thomas is not qualified for the job he sought. Four witnesses, including two supervisors and two of Thomas's fellow security officers, asserted that Thomas does not speak or write clearly. Plaintiff's response to Guardsmark's statement that he does not possess good communication skills is unclear, but it effectively acknowledges that his

skills do not meet the standards necessary for the CITGO assignment:

> These supervisor [sic] has only work at the CITGO account, along with the employee who make the same statement. How would they know if their communication skill, writing skill, uniform dress code, attitude or anything else survive outside of the CITGO refinery plant. The only way you can judge a man is by letting him do what you say he can't do.

(*Id.* ¶ 41.) In response to a statement about his poor writing skills, Plaintiff stated, "Plaintiff stand [sic] by his statement, his writing isn't the best, that's while [sic] he type out his report when ever possible." (*Id.* ¶ 44.)

Where plaintiff does not show that he is qualified for a promotion, he does not create an inference of discrimination. *See Pafford*, 148 F.3d at 669 (no prima facie case of race discrimination in failure to promote plaintiff whose performance evaluations were satisfactory but who suffered from chronic absenteeism); *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1015 (7th Cir. 1996) (no prima facie case of race discrimination where plaintiff was disqualified for promotion by poor leadership and communication skills); *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 765 (7th Cir. 2001) (no prima facie case of age discrimination where plaintiff lacked warehouse experience required for promotion to warehouse assistant manager position).

Again, Plaintiff does not contest Defendant's assertions concerning his poor communication skills. In his lengthy response to those assertions (a portion of which is quoted above), Plaintiff identifies three other Guardsmark employees (a 22-year-old African-American woman, a 24-year-old white male, and another male officer whose age and race is not reflected int the record), who Plaintiff asserts were trained for the North Gate assignment but nevertheless removed from the position as unqualified. (Pltf.'s 56.1 Resp. ¶ 41.) Assuming the truth of these facts, they do not establish that Plaintiff himself was qualified for the position. Nor is there any evidence that another security officer of any age or race whose skills were similar to Plaintiff's was nevertheless awarded the North Gate assignment.

Plaintiff has suggested that his poor skills should not have prevented him from working at

10

the North Gate because Guardsmark had an obligation to train him for that position. The law does not support this theory. It is undisputed that Guardsmark trains employees for various assignments, but Guardsmark offers no training to any of its employees on basic communication skills. (Peterson Decl. ¶ 12.) As in *Pafford*, 148 F.3d 658, 667, Plaintiff has offered no evidence that he was denied training given to other similarly situated employees who were not members of the protected group. *See also Malacara*, 224 F.3d 729-30 (no showing of race discrimination where white co-workers were also denied cross-training requested by Hispanic plaintiff). In *Patel v. Allstate Ins. Co.*, 105 F.3d 365 (7th Cir. 1997), plaintiff claimed her employer failed to provide her with computer training on the basis of her national origin. The employer demonstrated that it was entitled to summary judgment on this claim where plaintiff lacked basic typing skills necessary for the computer training and where the employer concluded that plaintiff needed to "focus on her core competencies before taking on additional training." *Id.* at 372. Here, similarly, Plaintiff Thomas lacked basic communication skills necessary for the assignment he sought. He has not demonstrated that Guardsmark's failure to train him on the specific North Gate responsibilities constitutes discrimination.

## CONCLUSION

Defendant Guardsmark has demonstrated that there are no disputes of material fact and that it is entitled to judgment as a matter of law on Plaintiff's claims that Defendant discriminated against him on the basis of his race and age when it denied him the North Gate assignment. Because there is no evidence that Guardsmark trains any of its employees on the basic communication skills that Plaintiff lacks, his failure to train claim also fails as a matter of law. Defendant's motion for summary judgment (Doc. No. 36-1) is granted and Plaintiff's motion for summary judgment (Doc. No. 40-1) is denied. Judgment is entered in favor of Defendant.

ENTER:

Dated: August 23, 2002

REBECCA R. PALLMEYER
United States District Judge